**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**NORFOLK DIVISION**

**KENNY L. PATTERSON,**

      **Plaintiff,**

**v.**                                       **CASE NO.: 2:22cv451**

**UNITED PARCEL SERVICE, INC.**

      **Defendant.**

<u>**THIRD AMENDED COMPLAINT**</u>

COMES NOW the Plaintiff, Kenny L. Patterson (hereinafter "Plaintiff"), by

counsel, and for his Third Amended Complaint against Defendant United Parcel

Service, Inc. (hereinafter "Defendant"), states as follows:

**I.**         **Introduction**

This Third Amended Complaint is timely filed in response to Defendant's

F.R.C.P. 12(b) Motion to Dismiss.  F.R.C.P. 15(a)(1)(B).[1]

---

[1] This Third Amended Complaint is filed within 21 days after service of Defendant's Motion under 12(b)(6).  The initial Complaint, the First Amended Complaint, and the Second Amended Complaint were authorized, and perhaps required by the Court, and thereby were filed pursuant to F.R.C.P. 15(a)(2) with the Court's leave.  This is the first time Plaintiff has amended his pleading once as a matter of course under F.R.C.P. 15(a)(1)(B).  The purpose of the Rule is to put the Plaintiff on notice of potential defects and provide him with an opportunity to cure them without further intervention of the Court. *Sosa v. Prince William-Manassas Reg'l Adult Det. Ctr.*, Case No. 1:24-cv-00499 (E.D.Va. May 17, 2024); *Gilman & Bedigian, LLC v. Sackett*, 337 F.R.D. 113*; 2020 U.S. Dist. LEXIS 162375 **; 2020 WL 5338995 (Sept. 4, 2020) (holding that where a party has previously amended her Complaint pursuant to Rule 15(a)(2) but has not done so as a matter of right pursuant to 15(a)(1), the Plaintiff may still amend the Complaint as a matter of course, provided the filing is timely).  Also, to the extent the Defendant might claim that this amendment is futile, the doctrine of futility only applies when the Plaintiff seeks leave of Court to amend and does not have a right to amend.  The Plaintiff's right to amend once is absolute. *Galustian v. Peter*, 591 F.3d 724, 730 (4th Cir. 2010). Also, the Defendant has consented in writing to the filing of this Third Amended Complaint.

## II.  Nature of the Case

This case arises from Defendant's failure to provide Plaintiff reasonable accommodations and discrimination and retaliation in violation of the ADA Amendments Act of 2008 (ADAAA).  Defendant also discriminated against Plaintiff under the Age Discrimination in Employment Act (ADEA).  Plaintiff filed pro se and sought *in forma pauperis* status which the Court subsequently granted.

## III.  Jurisdiction and Venue

1.  Jurisdiction to bring this case under the ADA and the ADEA is vested in this Court by 28 U.S.C. § 1331.

2.  Defendant is conducting business throughout Virginia, including Suffolk where Plaintiff lives, and Virginia Beach where Plaintiff worked.  Venue is proper in this district and division under 28 U.S.C. § 1391.

## IV.  Parties

3.  Plaintiff was born in 1967.

4.  Defendant is a shipping and receiving supply chain management company operating internationally with over 400,000 employees.  Typical annual gross earnings exceed $90 billion, and typical annual net income exceeds $6 billion.

## V.  Factual Allegations

5.  Plaintiff joined Defendant in 1998.  In 2003 Plaintiff became a full-time package truck driver.

6.  When Plaintiff filed his EEOC Charge on February 10, 2022 Plaintiff had about 24 years of service with Defendant.

2

7.    Plaintiff underwent open heart surgery stemming from a severe mitral valve leak on October 7, 2019.  This was followed by three months of rehabilitation and recovery.

8.    This heart condition impeded the functioning of Plaintiff's circulatory system and prevented him from being able to work without a reasonable accommodation.

9.    Plaintiff's heart issues are permanent.

10.    Plaintiff meets with doctors regularly and takes daily medications to control his condition.

11.    Plaintiff returned to work as a driver full-time in January 2020.

12.    Plaintiff had difficulty driving his truck on his delivery route, however, and he informed his supervisor of these difficulties in January 2020.

13.    The first appointment Plaintiff could get with his cardiologist was April 29, 2020.

14.    Plaintiff's then supervisor allowed Plaintiff to work light duty jobs January 6, 2020 to January 26, 2020.

15.    On January 27, 2020 Defendant's supervisor told Plaintiff that he could no longer permit Plaintiff to work.

16.    Defendant told Plaintiff he would need to be "properly disqualified as a driver to move to working inside the building." This information was incorrect.

17.    However, January 27, 2020 to March 12, 2020 Plaintiff continued to perform light duty alternative work under Article 20, Section IV of the Union contract applicable to Disqualified Driver-Alternate Work.

18.     This was the beginning of continuing negotiations between Plaintiff and Defendant to accommodate Plaintiff in light of his disabilities and job duties and the Union contract.

19.      In the meantime, Plaintiff maintained his full-time status, seniority and regular pay as follows: from January to July 2020 $37.64 per hour; from August 2020 to August 2021 $38.44 per hour; and in the balance of 2021 $39.67 per hour.

20.     Plaintiff did not work at UPS in 2022 and 2023, but he was retained on the employment records of UPS.

21.     Defendant unilaterally removed Plaintiff from work March 12, 2020 even though Plaintiff's doctors had released him to return to driving without any restrictions in February 2020.

22.     But for Defendant's layoff of Plaintiff, Plaintiff could have continued to work inside the building as a disqualified driver until his medical situation improved enough for him to drive.

23.     The Union contract in Article 20, Section 4 gave him this right, including "bumping another employee."

24.     Under his Union contract, Plaintiff could have worked as a disqualified driver for up to two years, as long as his health was improving.  Plaintiff's health has always been improving from late 2019 to the present.

25.     Plaintiff was not able to see his cardiologist about his driving difficulties until August 7, 2020.

4

26.    The cardiologist diagnosed Plaintiff with Tachycardia (fast heart rate that can be regular or irregular) which caused his new and increased driving difficulties.

27.    By mid-February 2021, Plaintiff's heart condition was under control, but his vision was failing as a side effect of his heart condition.

28.    An ophthalmologist informed Plaintiff on June 7, 2021 that he had retinal tears in both eyes requiring surgery on each eye.

29.    The doctor set the surgeries for June 17, 2021 and July 21, 2021 respectively.

30.    The retinal tears contributed to cataracts (clouding of the eyes' lenses which causes loss of vision) and this condition required surgery.

31.    As a result of these dual eye issues which required surgery and healing, Plaintiff was not able to be operated on immediately for either issue.

32.    On July 7, 2021 Plaintiff's ophthalmologist told Plaintiff that he could only work daylight hours because of his vision limitations.

33.    Plaintiff's then supervisor told him on September 20, 2021 that Defendant would not accommodate driving in daylight hours only (even though there were plenty of daylight hours available for Plaintiff to complete his driving duties).

34.    Because Plaintiff had consistently started driving after daylight commenced and returned to work well before dark, even when this was not medically necessary, the limitation to driving in daylight hours was appropriate.

5

35. Plaintiff was extremely efficient and could uniformly complete what was supposedly ten hours of assigned work in eight hours.

36. As such, any suggestion that the typical ten hour shift for UPS drivers prevented Plaintiff from working only in daylight hours is bogus.

37. Plaintiff periodically worked five days a week, but he rarely, if ever, worked more than eight hours in a day or 40 hours in a week or earned overtime compensation.

38. Defendant's supervisor told Plaintiff that he could apply for the "ADA Program," but this would be restricted to work inside the building.

39. This was not Plaintiff's first choice (daylight driving was), but it was suitable as originally presented to Plaintiff by Defendant.

40. Bypassing the permanent disability requirement, Defendant told Plaintiff it was not aware of any appropriate openings, and it put Plaintiff on a six-month waiting list for the reasonable accommodation of working inside (no driving). That information was false.

41. On December 10, 2021, Defendant informed Plaintiff that the ADA program was for permanent disabilities only.

42. Plaintiff did not claim to have a permanent disability (as opposed to a permanent heart condition).

43. Plaintiff made it clear he wanted to drive during daylight hours, but Defendant would only consider work inside the building through the ADA Program. That was wrong.

44.     Defendant never told Plaintiff he had the right to "bump" one of the employees already working inside, but he actually did.

45.     Believing he had no alternative, Plaintiff requested work inside the building as a disqualified driver (as opposed to driving during daylight hours).

46.     At a meeting on December 10, 2021, Defendant told Plaintiff for the first time that the ADA Program would mean Plaintiff would lose full-time status, seniority, full-time pension benefits, and his then hourly rate of pay.

47.     Plaintiff considered this unacceptable as it violated the ADAAA and the Union contract.

48.     Defendant still claimed it had no job for Plaintiff even though that was false.

49.     Then for the first time Defendant said that such a position was only available to drivers if they were recovering from an on-the-job injury or illness.

50.     Contrary to Defendant's contention, the Union contract allowed the opportunity to work inside the building without the restrictions that Defendant imposed on Plaintiff.

51.     In response, Plaintiff pointed out that not only did the Union contract authorize this, but there were many employees who worked inside the building who were not subject to such restrictions regarding pay, benefits, hours and status.

52.     Defendant had permitted Plaintiff to work inside the building in January 2020 absent any loss of pay, benefits, hours or status.

7

53.     Out of frustration with the inconsistent statements by Defendant, Plaintiff had no alternative but to withdraw his ADA Program application in writing on December 13, 2021.

54.     Because of the series of incorrect and misleading statements by Defendant to Plaintiff, and the failure to accommodate him, Plaintiff is the victim of continuing violations of the ADAAA.

55.     Plaintiff repeatedly told Defendant and the Union he could and wanted to drive in daylight hours or work inside, including in January 2022.

56.     In response, Defendant told Plaintiff that he could return to his full-time position when medically permissible, but still refused to provide a reasonable accommodation.

57.     On April 30, 2022 when Plaintiff's EEOC Charge was pending and Defendant was aware of the Charge, Plaintiff learned that the UPS center where he worked had posted multiple open jobs for anyone to bid on.

58.     Plaintiff complained to UPS human resources in May 2022 and was told that once he declined the ADA program, UPS did not have to continue searching for a reasonable accommodation for him.

59.     That was false and violated the ADA because UPS knew Plaintiff needed an accommodation all along.

60.     The Court's consideration of an appropriate reasonable accommodation in this case should start with what the Union bargained for on behalf of its similarly situated members in the Union contract.

61. Another primary consideration should be the size and profitability of the Defendant, which demonstrates that virtually no accommodation could be an undue hardship for Defendant.

62. And with respect specifically to the Plaintiff's request that he be able to drive during daylight hours only, that was obvious, easy and effective.

63. In Defendant's Position Statement forwarded to the EEOC dated June 27, 2022, there is an acknowledgment by Defendant that Plaintiff was claiming failure to accommodate, disability discrimination and retaliation under the ADAAA, and age discrimination.

64. The Position Statement also confirms that Defendant "reviewed Patterson's ADA package and approved it to proceed to the interactive accommodation checklist meeting phase of the ADA process."

65. This shows that Defendant determined Plaintiff had a disability.

66. Plaintiff filed a Charge with the EEOC on February 10 2022. It specifically mentions age and disability discrimination, including failure to accommodate.

67. The EEOC issued Plaintiff a Right to Sue dated August 3, 2022 which he received a few days later.

68. Plaintiff timely filed suit in this Court on October 28, 2022.

69. At no time has Defendant disputed that Plaintiff's heart condition and/or his inability to drive is a disability.

70. This was not controversial as many cases have held that driving is a major life activity when your job is driving.

71.    Working has also been identified as a major life activity by the ADA regulations. 29 CFR 1630.2(i).

72.    Plaintiff was significantly restricted in the ability to perform in a class of jobs or a broad range of jobs in a variety of classes as compared to the average person having comparable training, skills and abilities.  29 CFR 1630.2(j)(3)(i).

73.    Plaintiff was absolutely at all times qualified to work inside the warehouse, and his Union contract says he will be afforded the opportunity to displace another employee and maintain pay, benefits, hours and status.

74.    Defendant also regarded Plaintiff as disabled initially because of the heart condition, and subsequently for his limited vision and related inability to drive at night.

75.    Defendant continually discriminated against Plaintiff as a result in 2020, 2021 and thereafter.

76.    Defendant also knew that Plaintiff had a record of a disability, and it discriminated against him as a result.

77.    Defendant's letter dated July 1, 2022 acknowledges that "Patterson remains eligible to seek an accommodation through our interactive process now as he has been at all relevant times."

78.    Plaintiff repeatedly sought two reasonable accommodations to no avail.

79.    The amendments to the ADA and its implementing regulations provide more explicit recognition that inability to drive imposes a disability under

10

the ADA.  The ADAAA regulations issued by the EEOC speak to the inability to drive as a qualifying one from a bread class of jobs thereby making one disabled:

> "A class of jobs may be determined by reference to the nature of the work that an individual is limited in performing (such as commercial truck driving...) or by reference to job related requirements that an individual is limited in meeting (for example, jobs requiring...driving...)."

80.     On February 17, 2023 Plaintiff filed a grievance with his Union.

81.     Plaintiff is aware of many employees who transferred to work inside the building as opposed to driving because of vision issues, high blood pressure or diabetes.

82.     Defendant has given Plaintiff numerous conflicting reasons for failing to permit him to return to work inside the building or drive only during daylight hours.

83.     In 2021 Defendant said this was simply impermissible, it was only allowed related to on-the-job injuries or illnesses, and he had to be in the ADA Program.

84.     Plaintiff provided UPS the medical documentation UPS requested.

85.     Plaintiff is aware of at least one other local driver who Defendant permitted to drive with vision issues comparable to Plaintiff.  That is, the inability to see well at night.

86.     This individual actually had an accident when driving at night, so UPS modified his route so that he would not have to drive at night.

87.     Plaintiff never asked UPS to modify his route, but simply said that he always had and always would be able to finish his route during daylight hours.

11

88.    Plaintiff is also aware of another individual, substantially younger than Plaintiff, who was allowed to work as a disqualified driver for one full year because of a serious heath condition.

89.    But Defendant falsely told Plaintiff that it did not allow any full-time driver to work inside the building unless it was related to an on the job injury or illness.

90.    This other individual was allowed to work inside the building until his condition resolved and permitted him to return to his normal driving position.

91.    Defendant violated the ADA, common sense, and the Union contract when it failed to permit Plaintiff to return to work as a disqualified driver back in December 2021.

92.    As additional evidence that Defendant violated Plaintiff's rights, Defendant has provided multiple different reasons for its actions or failure to accommodate Plaintiff in 2021.

93.    When Plaintiff asked for various reasonable accommodations during 2020, 2021 and 2022, instead of accommodating him, Defendant retaliated against him by continuing to deny him reasonable and available accommodations and preventing him from working at UPS.

94.    Defendant replaced Plaintiff with a substantially younger individual without any apparent disability.

95.    As a result of the foregoing, Plaintiff has suffered physical symptoms, such as: weight gain, insomnia, tension, headaches, panic attacks, memory loss.

96.     Plaintiff has also suffered emotional symptoms, such as: fear of the future, anxiety, depression, lack of concentration, mood swings, frustration, anger, humiliation, stress.

97.     Plaintiff was earning at least $80,000.00 pay a year and has also lost at least $20,000.00 per year in benefits, including paid pension and health insurance, as a result of Defendant's discriminatory actions.

98.     Plaintiff seeks reasonable attorney's fees authorized by the federal statutes he relies upon.

99.     Defendant continued to fail to accommodate Plaintiff again and again at least every 60-90 days in violation of the ADAAA between March 12, 2020 and August 2022.

**COUNT I – Failure to Accommodate under the ADAAA**

100.    Plaintiff restates the above allegations as if set forth at length herein.

101.    During the 300 days immediately preceding the filing of Plaintiff's EEOC Charge on February 10, 2022 (and thereafter) Plaintiff has endured multiple disabilities as defined by the ADAAA.

102.    At all times he was able to perform the essential functions of his job as a driver with accommodation, and to work inside without accommodation.

103.    During that time (and after) Defendant repeatedly failed to grant Plaintiff's reasonable requests for accommodation.

104.    It did so absent any evidence that any of the accommodations would be significantly difficult or expensive or an undue hardship.

105.    Plaintiff suffered the injuries and damages outlined above as a result.

13

106.    Plaintiff is entitled to compensatory and punitive damages, plus reinstatement as a full-time truck driver with back pay, benefits and seniority.

107.    At present Plaintiff's eyes permit day and night driving.

### COUNT II – Discrimination Under the ADAAA

108.    Plaintiff restates the above allegations as if set forth at length herein.

109.    Not only did Defendant violate its duty to provide Plaintiff with a reasonable accommodation, but it repeatedly discriminated against him based on his disability, his record of a disability, and Defendant's perception that Plaintiff was disabled, by refusing to treat him like it treated other employees.

110.    Plaintiff suffered the injuries and damages outlined above as a result.

111.    Plaintiff is entitled to compensatory and punitive damages, plus reinstatement as a full-time truck driver with back pay, benefits and seniority.

### COUNT III – Retaliation Under the ADAAA

112.    Plaintiff restates the above allegations as if set forth at length herein.

113.    In response to Plaintiff's requests for accommodation, Defendant sent him home without his pay or benefits on numerous occasions.

114.    Defendant continued to fail to accommodate him over and over again, and retaliated against him in 2022 as a result of his EEOC Charge.

115.    The retaliation, including when the EEOC was investigating Plaintiff's Charge, was reasonably related to his initial Charge and should have been developed by a reasonable EEOC investigation.

116.   That especially applies to the retaliation that occurred between March 2022 and August 2022 because Plaintiff filed his initial Charge.  It continued during that period.

117.   A claim of retaliation is properly exhausted when that claim is a continuation of the treatment alleged in the charge before the Court.

118.   This retaliation claim is based on the same accommodation requests, the same disabilities, the same relevant time period, the same adverse employment action referred to in Plaintiff's EEOC Charge, and involves the same actors.

119.   The retaliation claim is a continuation of the conduct charged, and accordingly was properly exhausted.

120.   The scope of a lawsuit may be broader than the language of the EEOC Charge, especially where that EEOC Charge was filed *pro se*.

121.   Generally administrative charges must be construed with utmost liberality since they are made by those unschooled in the technicalities of formal pleading.

122.   A reasonable investigation of Plaintiff's specific allegations in his EEOC Charge would have included retaliation.

123.   An administrative charge of discrimination does not strictly limit a lawsuit which may follow; rather, the scope of the civil action is confined only by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination.

124. If Plaintiff's claims in his judicial complaint are reasonably related to his EEOC Charge and can be expected to follow from a reasonable administrative investigation, Plaintiff may advance such claims in his subsequent civil suit.

125. This is particularly true when Defendant referred to Plaintiff's retaliation claim in its position statement demonstrating Defendant was afforded ample notice of the allegations against it.

126. A charging party need not provide a detailed essay to the EEOC in order to exhaust his administrative remedies.

127. This Court should strike an appropriate balance between providing notice to employers and the EEOC and ensuring Plaintiffs are not tripped up under technicalities.

128. The exhaustion requirement should not become a tripwire for hapless Plaintiffs, nor should a Court erect insurmountable barriers to litigation out of overly technical concerns.

129. Documents filed by an employee with the EEOC should be construed, to the extent consistent with permissible rules of interpretation, to protect the employee's rights and statutory remedies.

130. The only assistance Plaintiff had with his EEOC Charge came from the EEOC.

131. Plaintiff was not able to obtain legal advice from a lawyer until October 29, 2024.

132. This Complaint alleges the same type of discrimination as Plaintiff's EEOC Charge, but adds greater detail.

16

133.    The foregoing particularly applies to a retaliation case where it would unreasonable for a *pro se* individual to return to the EEOC and file an additional Charge, especially when the retaliation took place after he filed his initial EEOC Charge.

134.    Plaintiff's copy of his EEOC Charge does not contain boxes, so it is not entirely clear whether he checked the box for retaliation or not.

135.    It is clear that only age and disability discrimination are included on his copy, however.

136.    But even if Plaintiff left the box for retaliation blank, this fact alone does not determine whether he exhausted his administrative remedies.

137.    Rather, the Court should investigate the Charge as a whole with the blank box as only one factor.

138.    Because of the repeated denial of at least two different accommodation requests, Plaintiff alleged facts consistent with both a claim of disability discrimination and a claim of disability retaliation.

139.    Plaintiff's Charge asserted both protected activity under the ADAA retaliation claim, many requests for reasonable accommodations, and an adverse action arising from the failure to accommodate: he was prevented from working (if not actually terminated).

140.    Plaintiff suffered the injuries outlined above as a result.

141.    Plaintiff is entitled to all damages authorized by the ADAAA, plus reinstatement as a full-time truck driver with back pay, benefits and seniority.

### COUNT IV – Discrimination Under the ADEA

142.    Plaintiff restates the above allegations as if set forth at length herein.

143.    Plaintiff, at the time the age discrimination commenced, was 54 years of age.

144.    At all times Plaintiff had performed his job up to the legitimate expectations of Defendant.

145.    Indeed, Defendant has never suggested that Plaintiff failed to perform his job, and his long tenure with Defendant corroborates his qualifications and satisfactory job performance.

146.    Defendant periodically sent Plaintiff home without his normal pay and benefits and thereby subjected him to multiple adverse employment actions.

147.    Defendant accommodated individuals substantially younger than Plaintiff.

148.    The same considerations alleged regarding Plaintiff's ADAAA retaliation count above demonstrate Plaintiff exhausted his EEOC administrative remedy, and apply equally to his admittedly pithy ADEA Charge.

149.    At all times Defendant acted willfully as evidenced by the multiple, conflicting and bogus reasons it gave for discriminating against Plaintiff.

150.    Plaintiff has annually lost income of $80,000.00 and lost benefits of at least $20,000.00 as a result of age discrimination.

151.    Plaintiff is entitled to his back pay and benefits, doubled, plus reinstatement as a full-time truck driver with benefits and seniority.

152.    Every paragraph and every count is incorporated into each additional paragraph and count in this Second Amended Complaint.

WHEREFORE, Plaintiff moves the Court for compensatory and punitive damages and reinstatement under the ADAAA, and back pay and benefits, doubled, and reinstatement under the ADEA, plus attorney's fees should he successfully engage legal counsel, and such further relief as the Court deems appropriate.

TRIAL BY JURY IS DEMANDED.

Respectfully submitted,

**KENNY L. PATTERSON,**

By: /s/ Christopher Colt North
Of Counsel

Christopher Colt North
VSB#16955
The Consumer & Employee Rights Law Firm, P.C.
5629 George Washington Memorial Hwy, Suite D
Yorktown, VA 23692
Phone: (757) 873-1010
Fax: (757) 873-8375
Email: cnorthlaw@aol.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 30th day of May 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

/s/ Christopher Colt North

19